Count Arthur Dillon, Appellant, v. The Commercial Cable Company and Others, Respondents.

*Promoters of a corporation — a secret agreement that they shall receive a certain portion of its earnings — issue of common for preferred stock.*

The promoters of a corporation secured an agreement with it by which 800 out of a total issue of 1,000 shares of preferred stock, which were to be entitled to fifteen per cent of the net profits of the corporation, were to be issued to them. Subsequently these shares were canceled by consent of the promoters, but upon the express though secret promise of the main promoter that the promoters should still have the same rights and advantages as if no cancellation had taken place.    After the cancellation the stock of the corporation was largely increased, and was sold to third persons.    About six years later one of the promoters brought an action to compel the issue to him of his portion of the preferred stock, or, in the alternative, an amount of common stock which would represent the same value.

*Held,* that the promise was the individual promise of the chief promoter;

That if it were assumed that the main promoter could bind the corporation by such secret promise, the court would not enforce it to the injury of innocent purchasers of the capital stock as increased;

That as the evidence disclosed no agreement to issue to the promoters any stock other than preferred, there was no basis for a claim that common stock should be issued equal in value to the preferred stock which had been voluntarily canceled at the request of the promoters.

Appeal by the plaintiff, Count Arthur Dillon, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 11th day of June, 1894, upon the report of a referee dismissing the complaint upon the merits.

*A. R. Dyett,* for the appellant.

*Wm. G. Choate,* for the respondents.

Parker, J. :

The plaintiff and the defendants Mackay and Bennett in September, 1883, entered into an agreement which had for its ultimate design the creation of a corporation for the purpose of constructing a sub-marine telegraph cable between the coasts of France, Great Britain and America.    By it Mackay agreed to contribute the sum of $3,000,000, Bennett $1,250,000, and the plaintiff the sum of

$50,000, to be expended in furthering the object which the parties had in view.

Pending the incorporation, the parties organized themselves into a committee to prosecute the work, with the agreement that as soon as possible they should become the board of directors of the contemplated corporation.     Preliminary work of an important and comprehensive character was at once undertaken by the committee, which was immediately supplemented by a submission to the committee of a formal article of association by the plaintiff, which provided for the formation of the Mackay-Bennett Cable Company, and, among other things, embraced a scheme for special compensation or profit to the promoters.

The details of it are unimportant, as it was not adopted, Mr. Bennett suggesting, as appears from the minutes, that although the scheme was a usual one in Europe, it was not in conformity with the laws of the State of New York under which it was proposed to incorporate the company.

December 12, 1883, the Commercial Cable Company was incorporated under the laws of this State, and on the second day of January following, the "committee" held a meeting in Paris at which all of the members were present.     The provisions of the charter of the company were approved, and certain resolutions were adopted looking to the transfer to the company of all the contracts, rights and privileges which the committee had acquired from France, Great Britain and the United States, upon the repayment of their cash advances and compensation for their services as promoters. The steps taken on that day by the committee were supplemented at a meeting of the committee held on February first, resulting in the formation of a definite proposition for submission to the Commercial Cable Company.

Later, and on April 1, 1884, the first meeting of the board of directors of the cable company was held, at which the following resolution was adopted:

"*Resolved*, That the proposition of the original organizers and promoters of this company, to transfer to this company all of the contracts made by them relating to ocean cables, and all their rights and privileges granted in France, Great Britain and the United States, with reference to the same, in consideration of the repay-

ment of their cash advances and interest, and of the creation and issue to them of 1,000 shares of the par value of $100 each of the preferred stock of this company, such preferred stock to be entitled to receive by way of a dividend 15 per cent of the net annual earnings of this company, such net earnings to be set apart out of the gross earnings for each year after the payment of all expenses, and after the deduction from the gross earnings of all sums necessary for the maintenance, reparation and replacement of the cables and other lines owned by this company and directly in connection therewith, and as a part of its ocean cable system, and, after carrying to the sinking fund such sum as may be deemed prudent and necessary, and such dividend of 15 per cent of such net earnings to be paid before or at the time of the declarations and payment of any dividend upon the common stock of this company, to be accepted by this company, subject, however, to this modification, viz., that only 800 shares of the said stock shall be paid to said original promoters and their associates, and that the remaining 200 shares shall be held in the treasury subject to the future action of this board, and that the said 800 shares of said stock shall be issued and delivered so soon as the requirements of the next following resolution are complied with."

As the capital stock of the company had been fixed by its certificate of incorporation at $4,000,000, a resolution was adopted at the same meeting of the board of directors directing the counsel of the company to take such action as should be necessary for the creation of the 1,000 shares of preferred stock provided for by the resolution. The provision for the issue of the stock was the outcome of a plan which the committee contemplated at the outset, and which was suggested in the scheme submitted by the plaintiff to the committee shortly after the making of the first contract, to secure to themselves compensation for their services as promoters. The failure to fully execute and abide by this plan, to deliver 800 shares of the preferred stock to the promoters, furnishes the occasion for this controversy.

It so happened that the outcome of that which was done operated to deprive this plaintiff, and the other parties as well, from receiving any portion of the preferred stock or its equivalent, so that for their services as promoters no compensation has been

received. By this action the plaintiff seeks to secure the rights and benefits assured by the contract with the cable company. How it happens that by the judgment under review it is held that he has no rights against the corporation which he can enforce, will appear from a brief examination of the subsequent conduct of the promoters and the cable company. Immediately after the meeting of the directors above referred to, steps were taken to accomplish an increase of the capital stock to $4,100,000, by the addition of 1,000 preferred shares, but it was not completed until about the 10th of September, 1884.

In the interim however, and on July fourteenth, the directors, by resolution, directed the officers of the company to execute 800 of said preferred shares under the company's seal, and deliver the same to Mackay and Bennett and the plaintiff, in accordance with the resolution of April first. Upon the transfer of the contracts mentioned in the resolution, the original stock of the company, being 40,000 shares of the par value of $4,000,000, was issued and delivered to Mackay, Bennett and the plaintiff in payment of their cash advances and interest. The preferred stock, however, was never issued as directed by the resolution of July fourteenth.

Instead, nearly two years thereafter, and on the 8th of May, 1886, the three promoters, Mackay, Bennett and this plaintiff, united in the execution of a request to their counsel to prepare a resolution to be agreed to and carried by the board of directors of the cable company, which should stipulate "that the existing preference shares issued at the request and for the benefit of the said directors, shall be canceled."

June fourteenth following the directors of the cable company adopted a preamble and resolution founded upon this request.

The preamble recited the original proposition of the promoters to receive the preferred stock; the action of the board of directors directing the increase of capital stock of the company, in order to comply with its agreement with the promoters; the formal agreement under the hands of the promoters to release the company from such issue; and the request that the company annul and cancel the same. The resolution was as follows:

"Now, therefore, it is resolved that this company does accept such surrender of said stock, and of all the claims of the aforesaid

Messrs. Mackay, Bennett and Dillon thereto, and does hereby revoke and cancel the authority heretofore given for the issuance thereof, and that the counsel of this company be requested to cause such proceedings to be taken as may be necessary for the purpose of reducing the capital of this company to the original amount of $4,000,000 of common stock, and that the authority to create any preferred stock be put at end."

The plaintiff was at once informed of the action of the directors, a copy of the minutes reaching him on the twenty-ninth of the same month. Such proceedings were thereafter had as reduced the capital of the company to $4,000,000.

In August following the plaintiff sent his certificate of stock to the company with a direction that it be canceled and replaced by a certificate of the new issue. This was done and the new certificates were accepted by him on the twenty-third of October.

This action was commenced in May, 1892, and prior thereto this plaintiff demanded of the cable company that it create 800 shares of preferred stock of the par value of $100 each, and issue 266 shares thereof to him, or issue 12,000 shares of the capital stock of the company of the par value of $100 each to Mackay, Bennett and himself, one-third thereof, or 4,000 shares, to be issued to him, or that it pay him the value of the 4,000 shares, together with all dividends declared thereon since the organization of the company.

The plaintiff's position is, that while it is true he surrendered for cancellation his preferred stock, he did not by so doing discharge or affect the liability of the cable company to pay over to the promoters eight-tenths of fifteen per cent of the annual profits of the company; that the agreement of the company was to secure to the promoters such a proportion of the annual net earnings, and the issue of preferred stock was selected as a method by which that result could be legally accomplished, the surrender of his stock being intended by him merely as a giving up of the method and not as a surrender of his right to receive such a proportion of the annual profits of the company as he had contracted for. In other words, that the transaction was one of form, not of substance, the canceled stock being replaced by a secret understanding, which should secure to the promoters all the benefits and rights that the stock would

have given had it been retained.   The minutes of the directors and the records of the cable company show no such arrangement.   If there was one it was impossible for the stockholders to ascertain the fact by inspection of the books and papers of the company or otherwise.

Subsequent to the cancellation of the preferred stock the capital was increased from $4,000,000 to $6,000,000, and later to $10,000,000.   Each purchaser of the increased issue of stock had a right to assume that it was entitled to receive, by way of dividends, all the net earnings of the company, and not that the promoters had a secret right to eight tenths of fifteen per cent of the annual profits of the company.   And if such an agreement existed between the promoters and the company, the court, had it the power to compel the company to create the stock for them, would not exercise it after the rights of third parties had intervened, by the purchase of the large amount of stock resulting from the increase of the capital from $4,000,000 to $10,000,000.

To enforce such a secret arrangement would constitute a most dangerous precedent, for it would in effect recognize the right of a corporation to create stock without certificates, to pay dividends without stock, to increase the capital stock without obeying the formalities prescribed by statute, and create a class of stockholders not recognized by the stock books and unknown to the stockholders of record   Such a scheme the courts will not tolerate.   Again, it seems to us that such an agreement between the company and the plaintiff has not been proved.   The books of the company show no such arrangement or understanding, nor was there any writing to that effect executed.

Plaintiff's contention is that he was induced to consent to the cancellation of the preferred stock by the promise of Mr. Mackay that he should lose nothing thereby, and that Mackay's promise was the promise of the company.   There is evidence that such a promise was made, and we credit it, otherwise it would be difficult to understand how the plaintiff could have been induced to surrender his preferred stock.

But the question is, whether the promise was that of Mr. Mackay personally, or that of the company ?

It is conceded that Mackay was authorized to do what a board of directors might do, and the inquiry, therefore, is whether that which

he did was a corporate act done in pursuance of the authority conferred on him, or his personal act ?

An examination of the letters and of the conversations testified to satisfies us that the promise was made by Mackay, and that the plaintiff so understood it.

Mackay was the dominating spirit of 'the enterprise, and not only in the letters written to the plaintiff respecting the cancellation of the preferred stock was it referred to as Mr. Mackay's wish, but in the oral testimony of the plaintiff touching the conversations had between him and Jules de Castro, Mackay's wishes, assurances and guarantees were constantly referred to, but the cable company seems not to have been considered or discussed.

The act of Mackay, therefore, purported to be a personal, not a corporate, act.

We also agree with the learned referee that the act complained of was not fairly within the scope of authority which Mackay exercised, but that subject has been discussed at such length, and so thoroughly by the referee, that we refrain from its consideration.

So far we have said that the surrender and cancellation of the promoters' stock was, so far as the cable company was concerned, the voluntary action of the promoters, for the company did not hold out any inducement or even proffer a request to bring about that result.

And, further, that had the stock been surrendered by the plaintiff and the other promoters upon a secret agreement or understanding, that, nevertheless, the promoters should receive eight-tenths of fifteen per cent of the annual profits of the company, such an agreement would not be enforced, as the stock of the company has been purchased by third parties without notice of the secret arrangement.

This brings us to the consideration of the other position taken by plaintiff, that if it should be held that he is not entitled to stand in front of the shareholders to the extent of his proportion of eight-tenths of fifteen per cent of the annual profits as originally provided for, he is entitled to have such a proportion of the stock issued to him as will equal in value 266 shares of the preferred stock, which he estimates to be 4,000 shares.

The last demand is said to be not open to the objection that a purchaser of the shares for value will be in any wise injured, for

their purchases have been made with full knowledge of the extent of the issue authorized.

If it be assumed that this demand is free from the difficulties which deny to the plaintiff the right to receive the preferred stock prayed for, it is, nevertheless, confronted with objections equally effective.

In the first place, there is no proof of an agreement to give the plaintiff a part of the common stock. If it be said, that while this is true, yet the company agreed to pay the promoters eight-tenths of fifteen per cent of the annual net profits, for which the preferred stock was to be issued merely as a means of securing payment, and a court of equity should decree a substantial performance in the only way open to it by directing a proportionate issue of the common stock, we answer that such was not the agreement as we understand it.

The terms of transfer, as expressed in the resolution of April first, were stated to be repayment to the promoters " of their cash advances and interest and of the creation and issue to them of 1,000 shares of the par value of $100 each of the preferred stock of this company, such preferred stock to be entitled to receive by way of a dividend fifteen per cent of the net earnings of this company."

There was no other agreement then or afterwards touching the compensation to be paid to the promoters. Specific performance of that contract might have been enforced, but the voluntary surrender of the promoters' right to receive that stock without an arrangement for other stock or compensation, affords no basis for a decree that the company should turn over to the promoter stock of a different character as an equivalent of that surrendered and canceled at his request and without reservation.

A still further answer to plaintiff's contention in such respect is, that there is no proof that there is any common stock unissued which might be distributed to him. The plaintiff was undoubtedly persuaded to so act as to injuriously affect his interests by the promises of Mackay, and it may well be that he has an adequate remedy against him, but if the views expressed be sound he cannot obtain relief as against the cable company.

The judgment should be affirmed, with costs.

VAN BRUNT, P. J., and O'BRIEN, J., concurred.

Judgment affirmed, with costs.